17-7042 and 17-044. Council, you may proceed. Good morning. May it please the Court. Avi Kupfer for the Federal Appellants. With the Court's permission, I'd like to reserve three minutes for rebuttal. With me at Council's bench is Clint Cowan, who represents the United Kituwa Band, the UKB, and he's prepared to answer any questions that the panel has specifically for the tribe. In ruling that the government couldn't take into trust a parcel owned by the UKB, the District Court made three errors. Could you address the jurisdiction issue first? Absolutely, Your Honors. It's our position that the District Court's order was final. It had all the markings of a final order. It resolved all of the issues in the case. It granted relief to one of the parties. The Court entered judgment in favor of that party, and the Court didn't contemplate any additional judicial proceedings and didn't require any additional administrative proceedings. So it's the government's position that the order itself was final. Even if the panel were to find that the order was not final, it would fall into the exception for practical finality, because several of the holdings of the Court are requirements that the agency would have to administer in any future trust land and trust application of the UKB, and it would not have an opportunity to challenge those holdings at any point before this Court. How would you distinguish this case from our decision in Miami Tribe of Oklahoma, where we did allow the BIA to appeal its own decision after an administrative remand? Your Honor, I have to admit I'm not familiar at this moment. I can't recall the distinction between that case and this, and I'm happy to submit 28J. This is on the practical finality side. It's assuming that the administrative remand rule applies. Again, I can't speak to Miami Tribe of Oklahoma at the moment, but it's our position that in any future land and trust application, the District Court is requiring the BIA to obtain CNO consent, Cherokee Nation of Oklahoma consent, and to analyze whether the UKB is under full administrative remand. Well, okay. Just one other question on this point, because I know we've got a lot to cover. But on the practical finality issue, why couldn't the Tribe appeal if the Department denies the application on remand? The Tribe could appeal, but there are precedents from the Supreme Court and this Court which say that it's practically final with respect to the agency. That's the party that would not appear for purposes of practical finality, because the agency would be foreclosed from future review of this decision. The agency couldn't participate at that point? Well, the agency would be making the decision that the UKB would be appealing in that future. That's my point. I mean, the agency would be able to participate. And wouldn't that, if we weren't to exercise jurisdiction here and we have the remand, and especially given that the Tribe's lands are within the original Cherokee territory, and the Cherokees are opposed to these trust acquisitions, wouldn't this just come right back? Again, do we really need to do this appeal at this point? I mean, there's still work to do. There was a remand from the District Court, and you're arguing practical finality, but I'm not sure you've got it. Well, our position is that there was no remand from the District Court. I understand. And I think that there's also a third way that this Court would have jurisdiction, which we did not brief. The District Court labeled its action an injunction, and certainly if it were an injunction, its decision would be interlocutorily appealable under 1292. So there are three pathways we believe that this Court could choose to hear this case. Thank you, Counsel. Well, with respect to the three holdings on the merits, we believe that the District Court erred in all three regarding the meaning of Section 3 of the OIWA, the Oklahoma Indian Welfare Act, regarding the requirement that it placed on the UKB, or on the BIA, to obtain CNO consent for the acquisition, and in its holding that the Assistant Secretary's weighing of two of the regulatory trust factors were arbitrary. I'll address those in turn unless the panel has specific issues they'd like me to go to. So then turning to Section 3 of the OIWA, that section was Congress expanding the Secretary's authority to tribes that were not necessarily encompassed within the IRA's definition of Indian. Those are recognized tribes of Indians residing in Oklahoma, of which the UKB is one. Congress recognized it in 1946 for purposes of the OIWA as a recognized tribe residing in Oklahoma. So therefore, the Assistant Secretary correctly found that it had authority to acquire or rather to consider the UKB's trust application pursuant to Section 3 of the OIWA, rather than dealing with the complex and complicated historical question that it would have to address if it took the land into trust. Well, doesn't the OIWA cross-reference the Indian Reorganization Act, and doesn't Section 3 depend on the definition of Indian in the Indian Reorganization Act? That's what the District Court held, and it's our contention that in so holding, the District Court confused benefits and beneficiaries under the Act. Indian tribes under the IRA were the beneficiaries of certain rights and privileges. Section 3 took benefits of the rights and privileges that were given to those Indian tribes under the IRA and gave them to a different group of individuals, recognized Oklahoma Indian tribes as Section 3 states. And I think that reading is also supported by the fact that Congress chose to import the IRA's definition of Indian into a different section of the OIWA, Section 4, for purposes of determining whether which Indians were able to form local cooperative associations. So Congress explicitly said that for purposes of Section 4 in forming local cooperative associations, the beneficiaries are Indians within the definition of the IRA, but for Section 3 and the rights and privileges, those benefits under the IRA, the beneficiaries are different. They're recognized Oklahoma Indian tribes. The second issue where the District Court made a holding in error was on a requirement of CNO consent for the trust acquisition to proceed. Before we leave the IRA and the OIWA has its own provision for allowing Indians and Indian tribes and corporations to take land into trust. Why doesn't that suggest that when they said rights and privileges, they didn't mean the trust, the right to take land into trust, where you had that, doesn't that make it superfluous to have a trust, a grant of the right of trust specifically in the OIWA? I don't believe so, Your Honor. I think you're referring to Section 1 of the OIWA, which contemplates certain land into trust acquisitions for agricultural purposes. The importation of the rights and privileges under the IRA is a much broader grant of land into trust authority. But why do you need the grant in the OIWA? Because under the IRA, you certainly could take agricultural land into trust, right? It's broad enough to cover that. So what was the purpose of having both? As I said, Your Honor, I think the purpose was that Section 1 doesn't get at all land into trust acquisitions, whereas Section 5 of the IRA does. Which supports my point. If you already had that power because I gave you the privileges and immunities available under the IRA, why do I then need to have a separate provision giving you the right to take land into trust for agricultural purposes under the OIWA? Do you understand my question? Absolutely, Your Honor. I agree that there's some overlap between Section 1 and Section 3, but I believe the point stands that the language of Section 3 is broad. It says rights and privileges, and that includes the rights and privileges under Section 5. Certainly some of those rights and privileges are also encompassed in Section 1 of the OIWA. But I don't think that necessarily detracts from the point that the language in Section 3 is broad, and it discusses rights and privileges broadly. And one of those rights and privileges is the right to petition to have land taken into trust. Could I just get a clarification on this issue as well? I take it then your position is that one of the provision in the IRA Section 5, this would be Section 5108, that authorized the Secretary to acquire interest in lands including trust or otherwise restricted allotments for the purpose of providing land for Indians, that that provision simply doesn't apply here. Is that your position? No, our position is that is the basis of the authority to Indians, plural, not tribe, Indians, then why isn't the definition of Indian in the IRA a relevant consideration here, which then takes us into the reason that this case got remanded? So our position is that Section 5 of the IRA does two things. It explicates a right or privilege, that's the ability to have land taken into trust, and it denotes who the beneficiary of that privilege is under the IRA. Indians as defined in the IRA. Congress in 1936 took that right or privilege, which is the ability to have land taken into trust, and it gave that to a different group of people, recognized Oklahoma Indian tribes. It's our position that the District Court's definition of rights and privileges in importing the definition of Indian failed to distinguish between benefits and beneficiaries there. And I think it makes sense when you consider what the policy implications of the OIWA were. Let me just ask you one other question about this. Under that interpretation, does that mean, at least for purposes of land acquisition and trust, that the Oklahoma tribes would be treated differently from tribes in other states? And if so, why would Congress want to do that? So two responses, Your Honor. First, I think the first place to look for the meaning of this provision is the text. I'm kind of getting to this bottom line. And does your interpretation mean that the United States of America is going to treat tribes in Oklahoma differently from tribes in other places, in other states, for purposes of taking land acquisition in trust? The short answer is yes. Again, this is a complicated historical question. But in the 1930s, there were those in Congress who believed that it was obvious who was an Indian in Oklahoma. It was basically everyone residing in eastern Oklahoma. So recognize Oklahoma Indian tribe didn't need further explication. It didn't need further definition. But thinking more broadly of Indian tribes around the United States, Congress did feel the need to provide some additional definition under the IRA of what an Indian and an Indian tribe were in that context. So, yeah, we would posit that, yes, there was always a distinction between Oklahoma Indians and other Indians. And this bears out in some of the background in Kacheri. It bears out in the legislative history of both acts as well. If there are no further questions, I'll reserve the remainder of my time for rebuttal. Thank you, counsel. David McCullough. May it please the Court. I'm David McCullough for the Afflee Cherokee Nation. Cherokee Nation, there's been some conversation and conversations in the brief. Cherokee Nation is, this before you today, is the same Cherokee Nation that first entered into treaties with the U.S. in the 1700s. It's the same Cherokee Nation that was involved in litigation at Supreme Court level as to the status of tribal lands and its authority to control its tribal lands in the 1830s. It's the same Cherokee Nation that had a constitution in 1839. Same Cherokee Nation that signed the 1866 treaty. Same Cherokee Nation moved to Oklahoma. It's the same Cherokee Nation historically. And the reason why we're here today is that the Department of the Interior of the United States has made a decision that the Cherokee Nation that existed in 1834 no longer exists as a political division. That's the bottom line of why we're here. And based on that determination, that the UKB, the United Katooban, is a successor of interest to the historical Cherokee Nation and that the UKB now has a shared reservation with the Cherokee Nation. That's why we're here. None of the decisions made by the BIA in this application can be supported without the initial determination that there's a shared reservation because the Cherokee tribe that's existed for 200 years ceased to exist around 1901. That's why we're here today. Well, at the time of the treaty, the U.S. government recognized that there was one Cherokee Nation with two factions. No. I'm sorry. I shouldn't have said it that way. Go ahead, Your Honor. Well, if I were to tell you that the legislative history around the treaty supports that, would that change your analysis? Are we talking about the Treaty of 1866? We are. Okay. In the Treaty of 1866, and was first brought forth really in this case in the appellate's brief at the time, referenced the treaty negotiations for 1866. And in those negotiations, two entities participated in the negotiations. There was a southern entity and a northern entity. The southern entity entered into a treaty, but that treaty was never ratified by Congress. The northern one entered into a treaty that was ultimately the 1866 treaty ratified. That's my understanding, Your Honor. So that would be my... Well, let's say that historically we had one Cherokee Nation and they had two factions and they settled on different parcels of the same historical reservation land. Okay. And that today they're recognized by the federal government as two separate tribes with equal powers and a right to be treated equally under the law. Well, let's say that. I obviously wouldn't agree that that's the situation. Let's say that because we have, because what we have as between the Cherokee and I'm going to call the UKB, Your Honor, just for short. So as between the Cherokee and the UKB, what you have is a Cherokee Nation, a single nation, which in the 1866 treaty, there's language in there that says that this is a single group. All disputes in the past have been resolved. This is a single group. So what you have is the Cherokee Nation that after the 1866 treaty moved into the allotment area where Oklahoma was going to become a state and something had to be done with the tribes in Oklahoma. And so we go through the legislation, the 1901 when there was an attempt to allot the lands, the 1906 legislation where the five civilized tribes were deemed to be continued in existence. They continue to today. What happened was you had another band, the UKB, that had continually made applications to the entity and we want to be recognized. Interior kept turning that down. But does that matter? I mean, they are a recognized tribe today, right? They are a recognized tribe, yes. Okay. And under the law, I mean, we've got the law that you have to treat, you can't favor one tribe over another tribe. Would you agree with that? I agree with that, yes, Your Honor. Okay. The land is already owned in Fee Simple by the UKB. Correct. What is the problem in allowing it to be taken into trust for them when they own it in Fee Simple and it's on the land where they have resided for 200 years? Your Honor, as Cherokee tribal members, they resided for 1834 to the present as tribal members. The UKB elected and those people elected to no longer be members of the Cherokee Nation, they severed that. Now, what's wrong with this, Your Honor, if we go to there's a reason why across the country if a tribe has a reservation, it has to consent before another tribe can take land into trust within that reservation. Well, but now they only have to consult, don't they? No, Your Honor. Your Honor, I understand the reference to the 1999 amendment, what that means. There are several levels of that. And if we want to focus on the 1999 amendment, the consultation language for just a second there. Well, let me ask you this. You don't contend that a BIA regulation governs over a statute adopted by Congress, do you? No, I don't contend that. Okay, so if they're in conflict, the statute would be what we would enforce. That's correct, Your Honor. And again, you're going to the 1999, I understand that. And let's look at the record in this case. The 1999 amendment says no funds shall be used to take, and this is an interior appropriations bill, I'm sorry. The 1999 Appropriations Act says no funds shall be used essentially, and I don't have it in front of me. Shall be used to take any land into trust within the boundaries of the original Cherokee territory in Oklahoma without, now it says, consultation with the Cherokee Nation. That's correct, Your Honor. On two levels, one dealing with how the district court dealt with that. The district court said that's purely dealing with issues of funding. That's correct in this sense, Your Honor. That Appropriations Act only applies to interior funding, and our position is that the land that they're talking about, assuming that there's not other reasons why that particular act isn't valid from our standpoint, but assuming that, the funds that they're talking about is, they have to receive monies from the federal government appropriated through the Department of Interior, and those monies are used to purchase land to be taken into trust. That's the way that, in our opinion, that has to be interpreted. You take that interpretation, there is nothing in this record that would support that any funds appropriated through Interior were used to purchase that land. That's conceding that there's not other reasons why that statute's not valid, but in this particular case, there's nothing in the record. As a matter of fact, in each side of the record says the tribe in their application says they bought the land with tribal funds and with federal funds. I didn't say where the federal funds came from. But, going beyond that, we agree with the district court that through an Appropriations Act, Congress cannot violate treaties, and we believe that the 1866 treaty, Article 26, which states that the Cherokees, no other tribe will come onto the land without the consent of the tribe, that that overrides the Appropriations Act, as the district court found in its order. Counsel, could I just use that issue to ask you about jurisdiction? So the district court said that the Cherokees would have to give the land to the Cherokees. Is that correct, too? That's what your brief says. It's correct, Your Honor, if I could maybe qualify that just a little. Well, let me do this. Let me ask you a question, and you can say whatever you want. So, if that were to happen, that we didn't take the case, and it goes back to the agency, and the Cherokee Nation doesn't give consent to the acquisition, there's every indication that it won't, then how can the legal issues decided by the district court ever get appellate review? And doesn't that show that we should be deciding this case? Correct, Your Honor, and in one sense, that's when I said I'd like to qualify that some, because in preparing for this hearing and looking at that issue and anticipating the question, it occurred in looking back that the district court really did essentially decide all the issues, and here's why. Because in the record in front of the district court, you have the 1937 solicitor's opinion where they denied again the UKB's petition to be recognized as a tribe, and that was obviously contemporaneously with the IRA. So then you have the Congress after that, and in 1946, okay, we're going to recognize them as a tribe. So what you have is the UKB and the U.S. who says, well, we didn't consider Carcieri in this matter, because that's what the court was focusing on. You didn't consider Carcieri. But, Your Honor, Carcieri was considered in this matter because it's clear from the record. In the 2009 decision from the BIA, they said we have authority to take land and trust under Section 5 of the IRA for the tribe. And then later they turn around and say, we need to examine Carcieri. Then they come back in 2010 and say, well, let's not go after trust land for a tribe. Here's some alternatives to go after. Let's do it when one of them was for the federal corporation. And then later in 2010, they state that we have tried, and this is from an email in the record, we have tried to use the opening of the footnote 6 in Carcieri and the rather unique language of the OIWA with regard to OIWA corporations to fashion a unique decision. The court, the district court said they never performed an analysis of Carcieri. We believe the record, and looking back at it now, that the record clearly shows that there was a Carcieri analysis. It was performed. It sounds like you're changing your position on whether there was an administrative remand, because the remand was considered Carcieri. Now you're saying that it was already considered. So I guess where all this is leading to is do we have jurisdiction or don't we? Your Honor, it's difficult to move away from the initial argument that we've made. I just said that I think there is a basis. I think there is a basis for that jurisdiction. All right. Can I just ask a different type of question? This kind of jumps ahead to one of the district court's rulings about whether the assistant secretary, the way the assistant secretary considered or didn't consider jurisdictional problems with the acquisition. Correct, Your Honor. You're with me so far? Yes. All right. What is the strongest evidence of conflict that the assistant secretary failed to address? I believe, Your Honor, it's the, as we say, shared reservation, then the service areas and the services that the Cherokees, or the dollars that the Cherokees are receiving, the UKB would make application for more of those dollars. There's also a question now of law enforcement. Who asserts jurisdiction where? Is it purely on your trust land? Is it within the reservation? Is it within the reservation lands? And I think those would be the, in the short time I have left, Your Honor, those would be the short, those would be the... It's your position that the assistant secretary did not look at those? Oh, absolutely. Did they not look at them? They totally ignored their own regional office who's closest to the situation and knows what the issues are and the conflicts are. Totally ignored their advice that they felt like there were conflicts. Sorry, Your Honor, I see my time's up. I'm perfectly willing to take more questions, but other than that, okay. Thank you. Thank you, counsel. I'd just briefly like to address two points. The first, regarding this issue of whether the CNO has to consider this land into trust acquisition before it's made. I think it's important to zoom out a little bit because the IRA doesn't put any geographic constraints on the secretary in terms of making land into trust acquisitions for various tribes. The secretary under the statute could make land into trust acquisition across the country from where a tribe has its historical base. The limits are all regulatory under 151.2, 151.8, and so on. The 1999 rider eliminated one of those regulatory hurdles with respect to the historical Cherokee reservation. That's Regulation 151.8, but there would still be other remaining hurdles. The secretary would still have to analyze under 151.11 whether an off-reservation acquisition made sense in this instance if this was not also the UKB's reservation. I see I'm out of time, so unless there are further questions, thank you.